# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook User ID: domingo-garivay<br>https://www.facebook.com/domingo-garivay<br>(Target Account 2) | Case No.  '23 MJ01308 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the   Northern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, 963 | Importation of and Conspiracy to Import a Controlled Substance |
| 21 U.S.C. §§ 841, 846 | Possession with Intent to Distribute and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See Attached Affidavit of Special Agent Ryan D. Brooks, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI Special Agent Ryan D. Brooks
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  telephone   *(specify reliable electronic means)*.

Date:   04/11/2023  

*Judge's signature*

City and state:  San Diego, CA         Hon. Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Ryan D. Brooks, being duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is offered in support of an application by the United States of America for a warrant to search the electronic files maintained by Meta Platforms, Inc., located at 1601 Willow Road, Menlo Park, California 94205, as more particularly described in Attachment A-1 and Attachment A-2, for the following Facebook accounts:

> Facebook User ID: domingo.garivay
> https://www.facebook.com/domingo.garivay
> **(Target Account 1)**

> Facebook User ID: domingo-garivay
> https://www.facebook.com/domingo-garivay
> **(Target Account 2)**

(collectively referred to as **Target Accounts),** both suspected of being owned and used by Domingo Alvarez GARYBAY (GARYBAY), and seize evidence of crimes, specifically violations of Title 21, U.S.C. §§ 952, 960, and 963, Importation of a Controlled Substance (and Conspiracy to do the same); Title 21, U.S.C. §§ 841, and 846, Possession with Intent to Distribute a Controlled Substance (and Conspiracy to do the same), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of GARYBAY for importing approximately 25.88 kilograms (57.05 pounds) of methamphetamine (see: *United States v. Garybay*, 23CR0086-DMS (S.D. Cal 2023)).

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since November of 2018. I am currently assigned to the San Diego Maritime Task Force under the HSI Office of the Special Agent in Charge, in San Diego, California. My current duties include investigating the smuggling of federally controlled substances into the United States. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia where I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime

scene, and the use of electronic evidence. I have participated in training programs related to controlled substances. I have also received training in the methods used by narcotics traffickers to import, distribute, package and conceal controlled substances.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at the ports of entry. During the course of my duties I have (1) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs crossing the border from Mexico into the United States, and while operating inside the United States; (2) executed or participated in numerous arrests for drug-related offenses, including possession with the intent to distribute; and (3) interviewed criminal defendants and witnesses in furtherance of investigations into the illegal smuggling and trafficking of controlled substances.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing third-party communications applications installed on cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual ("the driver") responsible for driving the vehicle containing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the driver regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently

communicate with the driver to remotely monitor the progress of the narcotics, provide instructions to the driver and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the driver to provide further instructions regarding the transportation of the narcotics to a destination within the United States.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FACTS SUPPORTING PROBABLE CAUSE

7. On December 19, 2022, at approximately 12:57 P.M., GARYBAY applied for entry into the United States at the San Ysidro, California Port of Entry (San Ysidro POE). GARYBAY was driver and sole occupant of a 2005 Toyota Camry bearing a California license plate (the vehicle). During primary inspection before Customs and Border Protection (CBP) Officer A. Nuno, GARYBAY stated that he was going to Corona, California, he was not bringing anything from Mexico, the vehicle belonged to him, and that he had owned it for approximately two months. CBP Officer A. Nuno inspected the trunk of the vehicle and discovered vacuum sealed packages hidden in the rear quarter panels. CBP Officer A. Nuno referred GARYBAY and the vehicle for secondary inspection. CBP Officers later discovered 55 packages from the trunk of the vehicle (34 packages from the spare tire well and 21 from the rear quarter panels) weighing 25.88 kilograms (57.05 pounds). A sample of the substance contained in the packages tested positive for methamphetamine.

8. GARYBAY was arrested and charged with Importation of Methamphetamine in violation of Title 21, U.S.C. §§ 952, and 960.

9. During the course of this investigation, counsel for GARYBAY provided the United States the hyperlink for **Target Account 1**. **Target Account 1** had images of the defendant and the name: "Domingo Garivay."

10. I discovered **Target Account 2** through an open-source search on Facebook for the name: "Domingo Garivay." I reviewed the Facebook account page for **Target Account 2** and discovered pictures that match GARYBAY.

11. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that **Target Accounts** were used to facilitate the importation of methamphetamine or some other federally controlled substance, and that **Target Accounts** contain evidence of this criminal activity.

12. Based on my training and experience, and in consultation with other law enforcement officers, I believe a search of the **Target Accounts** will reveal messages between GARYBAY and his co-conspirators. These messages may contain information regarding the identity of the individuals with whom GARYBAY communicated, locations of the individuals involved, and additional information regarding the coordination and importation of methamphetamine, or another federally controlled substance. I also believe, based on my training, experience, and knowledge of the particular facts of this case, that the acquisition of the Facebook data will assist investigators in determining the extent of GARYBAY's knowledge and involvement, and other yet unidentified associates or co-conspirators, in the smuggling of methamphetamine, or some other federally controlled substance.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

13. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## FACEBOOK AS SOCIAL MEDIA PROVIDER

14. Meta Platforms, Inc. owns and operates Facebook, a free-access social networking website of the same name, that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

15. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

16. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and

guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

20. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

21. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

22. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

//

23. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

24. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

26. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

27. Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

28. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such

communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

29. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime),

or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

30. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

31. All forensic analysis of the recovered data will be directed exclusively to the identification and seizure of the information within the scope of this warrant. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

32. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be disruptive and severe.

33. Therefore, I request authority to seize all content, including electronic communications and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Facebook account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the privacy of Facebook

subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, United States Homeland Security Investigations seeks authorization to allow Facebook to make a digital copy of the entire contents of the account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged, and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

34. Analyzing the data to be provided by Facebook may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic communications, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

35. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the

records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

36. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

37. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

38. Based on the foregoing, there is probable cause to believe that a search of the **Target Accounts** will yield evidence of violations of Importation of a Controlled Substance (and conspiracy to do the same), in violation of 21 U.S.C. § 952, 960, and 963, and 21 U.S.C. §§ 841 and 846, Possession with Intent to Distribute a Controlled Substance (and conspiracy to do the same). Accordingly, I request the Court issue warrants authoring law enforcement to search the items described in Attachment A-1 and Attachment A-2.

_____
Special Agent Ryan D. Brooks
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 11th day of April, 2023.

_____
Honorable Michael S. Berg
United States Magistrate Judge

# ATTACHMENT A-2

# PROPERTY TO BE SEARCHED

This warrant applies to information associated with the following Facebook user IDs and/or account names:

>Facebook User ID: domingo-garivay
>https://www.facebook.com/domingo-garivay
>**(Target Account 2)**

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc., a company headquartered in Menlo Park, California. Meta Platforms Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at:

>1601 Willow Road
>Menlo Park, California 94025

# ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.   Service of Warrant**

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.   Information to be disclosed by Meta**

To the extent that the information described in Attachment A-1 and Attachment A-2 is within the possession, custody, or control of Meta Platforms, Inc., regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A-1 and Attachment A-2:

(a)   Contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   Activity logs for the account and all other documents showing the user's posts and other Facebook activities October 21, 2022, up to and including December 20, 2022;

(c)   Photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from October 21, 2022, up to and including December 20, 2022, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   Profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists,

  including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) Records or other information regarding the devices and internet browsers associated with, or used in connection with, the user IDs, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) Other records and contents of communications and messages made or received by the users from October 21, 2022, up to and including December 20, 2022, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) "Check ins" and other location information;

(h) IP logs, including all records of the IP addresses that logged into the account;

(i) Records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) Information about the Facebook pages that the account is or was a "fan" of;

(k) Past and present lists of friends created by the account;

(l) Records of Facebook searches performed by the account from October 21, 2022, up to and including December 20, 2022;

(m) Information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) Privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta Platforms, Inc., is hereby ordered to disclose the above information to the government within **7 days** of issuance of this warrant.

**III.  Search of the Data**

The search of the data supplied by the ISP pursuant to this warrant will be conducted by United States Homeland Security Investigations as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of October 21, 2022, up to and including December 20, 2022., and to the seizure of:

a. Communications, records, and attachments tending to discuss or establish violations of Title 21, U.S.C. §§952, 960, 963, 841, and 846;

b. Communications, records, and attachments tending to identify Domingo GARYBAY (aka Domingo Garivay), and any co-conspirators involved in the activities in III(a) above; and

c. Communications, records, and attachments that provide context to any communications described above, such as electronic communications sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of 21 U.S.C. §§ 952, 960, 963, 841, and 846.**